**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **LARISSA YORK,** | |
| **Plaintiff,** | **CIVIL ACTION FILE NO.** |
| **v.** | |
| **MATTHEW LUTZ, SUSAN MIZELLE, and CURRITUCK COUNTY SCHOOLS,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## COMPLAINT

COMES NOW the Plaintiff, Larissa York, by and through her undersigned counsel, Thomas B. York, and hereby files this complaint against Matthew Lutz, Susan Mizelle, and Currituck County Schools, and avers the following:

### I.  JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Count I of this Complaint, which arises out of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 et seq. ("Title VII").

2.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Counts II-V of this Complaint, which arises out of the same transaction or occurrence as Count I.

3.      This court has jurisdiction over the parties in this action because the employment practices described herein took place in Currituck County, North Carolina.

1

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.  Venue is proper in the Eastern District of North Carolina because: (a) Defendants' unlawful activities were committed in the Eastern District of North Carolina—including in Currituck County, North Carolina; (b) Plaintiff worked in the Eastern District of North Carolina for Defendant Currituck County Schools; (c) all Defendants reside or have their place of operation in the Eastern District of North Carolina and they are subject to the Court's personal jurisdiction here in light of their presence in the Eastern District of North Carolina; and (d) all of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern  District of North Carolina.

5.     On August 10, 2022, by letter postmarked on August 5, 2022, the Plaintiff received her Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC") and files this Complaint within ninety (90) days of receipt of the Notice.

## II. PARTIES

6. The Plaintiff, Larissa York. is a citizen of the United States and a resident of Dare County, North Carolina.

7. The Defendant, Matthew Lutz, is a citizen of the United States and a resident of Dare County, North Carolina. He is employed as the Superintendent for Currituck County Schools, even though he fails to meet the statutory requirements for holding this position. At all relevant times herein, Defendant Lutz was acting under color of law and within the scope of his employment. He is sued in both his official and individual capacities.

8. The Defendant, Susan Mizelle, is a citizen of the United States and a resident of Pasquatank County, North Carolina. She has been employed as the Chief Financial Officer for Currituck County Schools, after defaming the Plaintiff so that she could take over her position as Chief Financial Officer. She was previously a subordinate of the Plaintiff. At all relevant times herein, Defendant Mizelle was acting outside the scope of employment. She is sued in her individual capacity.

9. The Defendant, Currituck County Schools (hereinafter referred to as "CCS"), is a public school district organized and operating under the laws of the State of North Carolina. CCS is responsible for the administration of educational services for all students enrolled in its schools in Currituck County. CCS receives federal financial assistance and is subject to Title VII.

10. The Defendants may be served by delivering a copy of the Complaint and Summons to their place of employment or operation at 2958 Caratoke Highway, Currituck, NC 27929.

11. Defendant CCS employed fifteen (15) employees or more at all times relevant to this matter.

### III. <u>FACTUAL ALLEGATIONS</u>

12.    Plaintiff was employed full-time by Defendants Lutz and Currituck County Schools as a Chief Finance Officer from July of 2019 until her termination on July 15, 2021.

13.    Defendant Lutz, at all times relevant to this case, was Plaintiffs' supervisor , who was given absolute control over employment decisions as to the Plaintiff.

14.    The Plaintiff is female.

15.    The Plaintiff received no disciplinary actions indicating poor performance prior to her termination.

16.    The Plaintiff worked several years, first as an Assistant Financial Officer, to obtain the experience and knowledge to become a Chief Financial Officer in North Carolina schools. She moved to North Carolina from Pennsylvania for the purpose of pursuing this career. This work included weeks of formal training by the State of North Carolina to become a Chief Financial Officer.

17.    After working as an Assistant Financial Officer for Scotland County Schools, she was rewarded for her hard work by being offered the position of Chief Financial Officer at Perquimans County Schools. During all these years, there was never any complaints about her work and every one of her supervisors, including all superintendents, give her high recommendations.

18.    The claims by Defendant Lutz that the Plaintiff did not perform well as a Chief Financial Officer are contradicted by her excellent employment history.

19.    The Plaintiff was next offered the position of Chief Financial Officer in Currituck County. She was hired when Currituck County had a competent, responsible, and honest Superintendent, named Mark Stefanik. There were no complaints about her work under Mark Stefanik and he has even recently given Larissa glowing recommendations.

4

20.    Unfortunately for Larissa, and the citizens of Currituck County, Defendant CCS promoted an insecure, arrogant, ignorant, dishonest, vindictive, sexual harasser, Defendant Lutz, to become Superintendent.

21.    Although the first few months working under Lutz were largely uneventful, as evidenced by the fact that Lutz made absolutely no complaints about her work, Larissa noticed that he did not respect most women and often talked to her in a condescending manner. Apparently, Larissa was fully competent as a Chief Financial Officer from June of 2020 to February of 2021, from when Lutz became Interim Superintendent to when the sexual assault and battery occurred.

22.    In late February 2021, Defendant Lutz scheduled a meeting with the Plaintiff in his office. When Larissa arrived for the meeting, she was unexpectedly asked to meet in the office next door to his office, which was formerly the office of Mr. Stefanik.

23.    Larissa entered the office first and was surprised to hear the door being locked behind her. Before she even had a chance to turn around, she felt hands firmly gripping both buttocks, she felt his face touching her neck and head, and she felt his disgusting breath against her neck. She jumped forward a few feet to escape the grasp of his hands and she is certain that she said something negative to him, but she really does not remember her exact words. She quickly sat down in the nearest chair in the hope that by placing herself in a chair so she would not be accessible to him to grab her again.

24.    When the Plaintiff indicated her disapproval of his conduct, Defendant Lutz seemed flustered and turned a deep red, and he seated himself across the desk from her. She does not remember much of anything being said by him, but she remembers him being very angry and speaking harshly with a reddened face glaring at her. Whatever he did say, which she did not pay much attention to because she was so upset, was said in an extremely angry voice. She felt threatened and scared. After a very short time of collecting herself, she bolted to the door, she fumbled to get it unlocked, and she was in great

fear of being molested again. She finally got out the door and walked quickly back to her office which is in another nearby building.

25.     The Plaintiff was very upset and was uncertain what action to take. She immediately called her husband, Tom, to describe the sexual assault that she had just experienced. Tom was extremely angry at first and even threatened to come to her office, which was over 45 minutes away, to confront Lutz. Tom asked her again and again what would cause him to do such a stupid and despicable thing to her. She had no explanation for this terrible event. After a few minutes of speaking with her husband, they started planning a strategy as to how to handle this terrible situation. Her husband advised her to do nothing rash and to wait until they could talk in person that evening to discuss the various options for handling the inappropriate conduct by Lutz.

26.     When Larissa got home, and over the next few days, she and her husband repeatedly discussed the reprehensible actions of Lutz and how they could best either punish him or at least neutralize him. Unfortunately, there were no good alternatives as every scenario probably would lead to the loss of her job.

27.     The Plaintiff knew that she was an "at will" employee and that a North Carolina statute stated that she served at the "pleasure" of the Superintendent.  The Plaintiff and her husband discussed how she could be fired for no reason at all.  They discussed how she might not be believed, especially by a School Board that ignored a state statute that required Defendant Lutz to reside in Currituck County so they could appoint him Superintendent.  They felt that the Plaintiff would be quickly fired if they reported the sexual harassment.

28.     The Plaintiff and her husband attempted to find the procedure of CCS for reporting sexual harassment, but the only procedure they could find seemed to give the final decision as to sexual harassment to her harasser, the Superintendent. Because of the inadequate procedural process that allowed Defendant Lutz to decide his own guilt as to his sexual harassment, with no alternative

procedure specified, the Plaintiff and her husband decide that any reporting of the sexual harassment would result in her further harm and in her termination.

29.     The Plaintiff was well aware of the mistreatment of the former Principal of Currituck High School

30.     The Plaintiff could not sleep much for days and she had great anxiety, especially when she was at work. She avoided Lutz as much as possible over the first few days after the incident, but this seemed to make him even more angry with her.

31.     The Plaintiff's income was and is extremely important to her family.  If there had been other jobs that even came somewhat close to paying what Larissa was making at Currituck County Schools, she would have immediately left her employment just to get away from this sick person, Defendant Lutz. However, there are not many jobs in the area of the Outer Banks for accountants or former Chief Financial Officers that pay nearly as well.  The Plaintiff decided that she could not risk her employment by reporting the sexual harassment where the system was so obviously biased in favor of Defendant Lutz.

32.     The Plaintiffs' oldest son had recently been diagnosed with a very serious medical problem and the family could not risk losing health care coverage for his extremely expensive treatments. She felt trapped and violated, but she felt there was no good alternative to her current position.

33.     Also, Plaintiff felt that leaving her employment would allow Lutz to win in his intimidation and evilness. Although Larissa and Tom desperately wanted to stop Lutz, they did not want to do something impulsive and destructive that would lose her employment.

34.     The Plaintiff also felt embarrassed and intimidated by the need to describe this embarrassing and traumatic occurrence to anyone else, especially when she might not be believed. The Plaintiff had no confidence that the School Board would believe her against their Superintendent.  She felt that there was no good course of action and that they were largely at the mercy of a very bad person.

35.     The Plaintiff and her husband decided not to take immediate action against Lutz, because he possessed all the power in this situation and would be protected by Defendant CCS. Based upon their experience since her termination, they are now certain that this was the right decision because the Board has not supported Larissa in even the slightest way, but has provided unlimited support for Lutz. If they had taken immediate action against Lutz, Larissa would have been fired and the Board would have supported the firing, as it has demonstrated recently, and the Plaintiff would have had no legal recourse whatsoever because she had only one limited incident of sexual misconduct.

36.   The Plaintiff and her husband decided the best course of action was to never allow a situation where the Plaintiff would be alone with Defendant Lutz, so that his inappropriate and disgusting conduct could never occur again. The Plaintiff agreed to implement this plan and avoid all unnecessary and isolated contact with Defendant Lutz where she would be in a vulnerable position.

37.     The Plaintiff decided to keep notes of all inappropriate conduct by Lutz so that, if necessary, she could provide specifics as to his improper actions. However, as to the notes, which are discussed below, the Defendants have lost, stolen, or destroyed them, which is further evidence of their guilt.

38.     The Plaintiff stopped going into work early or staying late so that she would not be alone in her office where she would be easy prey to Lutz. Although she still put in more than a full day of work on average, she made certain that she was only in the office when her staff was present.

39.     The Plaintiff turned down frequent requests from Defendant Lutz to meet at strange times early in the morning or late in the evening, because she would then have been alone with her harasser. The times requested by Defendant Lutz for meetings were greatly outside normal work hours with no logical reason related to work necessity.

40.     Defendant Lutz would become angry when she would refuse these meetings at weird times of the day or in strange locations, and he would often follow up with some criticism soon thereafter. After most verbal attacks that were unjustified and unprofessional, he repeatedly would state something to

the effect: "You know what I expect, and things will be fine if you just do it." The clear meaning was that she needed to give in to his sexual advances. She understood this to be a threat that the verbal harassment would continue unless she engaged in sex with him.

41.     Unfortunately, the limitation on Larissa's hours, so that she could prevent being alone with Defendant Lutz, was then used against her by Defendant Lutz to fabricate the claim that she did not work the requisite amount of time required by her job. The Plaintiff refused to meet with Defendant Lutz in any setting where she would be alone with him. This angered him and would result in harsh words or criticism, along with thinly veiled threats that she needed to give in to him.

42.     The Plaintiff's fear of Lutz was so great that sometimes she even requested that her meetings with him be conducted outdoors, so they walked around the buildings in full view of many others. There are a number of witnesses who can verify that Defendant Lutz and the Plaintiff would walk around the buildings while discussing business. In fact, Defendant Lutz would have never agreed to conduct meetings while walking around the buildings unless he understood the good reason why the Plaintiff made this request, which was obviously due to his previous sexual assault on her. Of course, this conduct by the Plaintiff just increased his anger and criticism of her.

43.     Defendant Lutz made his improper and illegal motivations especially clear when he inappropriately and embarrassingly discussed with Larissa an affair that he had with an Assistant Principal when he was her supervising Principal. He then concluded his story by stating how he helped her career, including good references, and how she was now doing very well professionally in another part of the state. The clear purpose of this story was to tell Larissa that affairs are acceptable, that Larissa would do well professionally if she had an affair with him, and that he would not give her a good reference if she did not give in to his sexual advances. The unspoken threat that came through was that Plaintiff would not do well if she did not have an affair with him.

44.     Defendant Lutz frequently invaded her personal space so closely as to threaten her with further physical contact. He would brush up against her in unexpected and unnecessary ways as though any physical contact gave him pleasure. At times, for example, if the Plaintiff was the last to leave a group meeting, he would stand in front of the doorway and prevent her from easily leaving unless she pushed past him. These actions were intended to harass and intimidate the Plaintiff. The Plaintiff was placed in constant fear of unwanted and inappropriate physical contact by Defendant Lutz. When the Plaintiff pulled away from him, expressed some objection, or extricated herself past a blocked doorway, Defendant would become angry, turning red, and seemed threatening in his appearance. Plaintiff knew that all such events would be followed by more unfair criticism of her work.

45.     Over the months since the physical assault, the Plaintiff and her husband discussed many times how to handle the continuing sexual harassment by Defendant Lutz. They were still convinced that the School Board would do nothing, and that the reporting of the sexual harassment would only result in the Plaintiff losing her job. They discussed how they hoped that Lutz would soon stop his mistreatment of her, since his advances had been thwarted, and Larissa would then be able to return to some level of comfort in her job. Since Larissa knew she was doing a good job, she never believed that she would be fired.

46.     An issue remains as to Larissa's aforementioned missing personal notes that have mysteriously "disappeared." Within minutes of her termination, the Plaintiff was strangely and abruptly forced to leave her work without her personal belongings, which included her notebook where she documented dates and events related to her sexual harassment. She was treated like a criminal even though no one has alleged any misconduct that would justify her termination, and especially would not justify her separation from her personal items. Defendant Lutz could have allowed her to remove her personal items on the date of her "firing," even if he watched her to be certain she only removed her own property. Instead, she was abruptly excluded from her office for roughly three (3) days without any

good explanation. Apparently, since items were admittedly removed from her office by the Superintendent or others, and possibly by Ms. Mizelle who conveniently replaced the Plaintiff as Chief Financial Officer and was aware of the Plaintiff's personal notebook, this exclusion from her own office was probably for the purpose of allowing them to search her office for evidence.

47.     When Larissa was finally allowed to return to her office, three days after her termination, her notebook was missing. The missing notebook was immediately mentioned to the HR Director, who pled ignorance of its whereabouts. A few days later, having heard nothing, Larissa requested in writing to the Board, the HR Director, and the Superintendent that the notebook be returned. No one denied that they had it. A few days later it was requested again from Respondent's attorney, and the request was again ignored. If the notebook was not in their possession, a reasonable person would have so responded.

48.     Nearly two months after the return of Plaintiff's notebook was first requested, Defendant's attorney suddenly claimed that they could not find it. Even if the notebook was not destroyed or hidden by Defendants' employees, which we do not concede, it was at least irresponsible and negligent to allegedly wait about two months to look for it. The person possessing it could have thought it was forgotten or unimportant, and they could have discarded it. The person in possession might have believed they escaped detection as to this theft, and they were emboldened to destroy it. This loss of the notebook has adversely impacted the preparation of Plaintiff's case.  Defendants were asked if there were security cameras or electronic systems that would identify who had been in her office on the days she was excluded, and the Plaintiff received no response whatsoever. Defendants or their representatives likely have taken Plaintiff's notebook, but they have now likely hidden or destroyed it.

49.     On July 15, 2021, the very same day that she was terminated, Larissa specifically advised the Defendants:  "I believe that I am a victim of sexual discrimination." Exhibit A. In response, the Defendants did absolutely nothing to follow up with the Plaintiff to determine the specifics of the

sexual discrimination. Then, on July 18, 2021, Larissa specifically asked the Human Resources Director how to file a claim for sexual harassment, and the Defendants again did nothing to follow up on this request. In fact, the Human Resources Director did not describe the method for filing a sexual harassment claim and instead told the Plaintiff that she should wait to hear from the attorneys for the Defendants.

50.     When the Defendants' attorney contacted her husband, on July 20, 2021, her husband specifically advised that there had been sexual harassment, but Defendants did not ask for any specifics until July 23, as though sexual harassment was an unimportant allegation. Instead, Defendants merely tried to settle the case by offering to not challenge the unemployment benefits for Larissa, which was of course inappropriate and unacceptable under the circumstances.

51.     Every time that the Defendants' attorney and Plaintiffs' husband talked there was a reference by her husband to the sexual harassment. When Defendants' attorney first made the request for specific details, her husband was in Pennsylvania addressing another case. Plaintiffs' husband responded with specifics as soon as possible on January 29. As a result, sexual harassment was reported on the day of her termination and several other times before January 29.

52.     There was some reluctance to share information with Defendants' attorney because Plaintiff believed the Defendants' attorney was representing Defendant Lutz and would only use any information to try to harm the Plaintiff. Only after three (3) times that the Respondent's attorney specifically denied his representation of Defendant Lutz, the Plaintiff shared some details as to the sexual harassment. Within a very few days, despite his claims that he did not represent Defendant Lutz, he announced that he was indeed representing Defendant Lutz at the Board's proposed sham hearing, and he has continued that representation before the EEOC. The Plaintiff was deceived because she was encouraged to share information with opposing counsel under the false claim that he did not represent Defendant Lutz.

53.     Defendants' attorney claims that after he was given details of the initial sexual harassment, he "sent Mr. York an email attaching the Board's policies governing sexual harassment complaints and informed Mr. York he could file a formal complaint." However, the complaint process not only had Defendant Lutz's staff conducting the "investigation," but Defendant Lutz would decide his own guilt or innocence under their flawed and biased procedures. The Plaintiff would have been foolish to file a complaint under a system that allows the sexual harasser to falsely rule that he had done nothing wrong. The procedural system of Defendant CCS did not provide any fair due process. Defendants' attorney never offered to replace Lutz as the decisionmaker under their system so there was never any reason to file a complaint under such a biased procedure.

54.     Plaintiff's attorney, her husband, timely advised the Defendants that the Plaintiff refused to participate in a sham hearing where she would not be given fair due process and where the bias of the Board would not allow a fair adjudication of the sexual harassment. On November 17, 2021, Plaintiff's attorney sent a nine-page single-spaced letter outlining point after point of the denial of due process. In response, the Board sent a letter that did not address virtually any of the many issues raised by Plaintiff's attorney, and instead simply stated that the Board "cannot respond to each of your allegations." The Board could not respond to the issues being raised by Plaintiff's attorney because they were all true. In response, Plaintiff's attorney sent an additional five-page single-spaced letter that stated additional issues with the lack of due process and elaborated on the issues raised in the earlier letter. The Defendants did not at all respond to these issues, because the statements by Plaintiff's attorney were all true.

55.     There were many unrebutted good reasons why the Plaintiff declined to participate in a sham hearing that denied all reasonable due process, but the most important reason was the highly arbitrary and grossly inadequate two-hour time limitation being placed on the Plaintiff's case presentation. This ridiculously short time period was to include all opening and closing statements, all witnesses

13

(including Plaintiff's testimony that by itself would take over two hours), all cross-examination (including the cross of Lutz that by itself would take over two hours), all submission of exhibits, and all arguments. Presenting a full and fair case for Larissa was impossible in a two-hour time period.

56.     Plaintiff's attorney clearly advised the Board of the impossibility of a fair hearing given the constraints imposed by the Defendants, but the Board refused to make any changes in an unwarranted and biased effort to protect Lutz. The Board never provided any reasonable analysis or argument as to why two hours was sufficient. Any reasonable person, and especially any experienced trial attorney, knows that two hours was grossly insufficient for this type of case, especially where Defendant Lutz has raised over twenty false claims against the Plaintiff, and continues to add false claims.

57.     Plaintiff's attorney laid out many other issues that demonstrated that the Plaintiff could not obtain a fair hearing. To cover just a few examples of the numerous issues: a. The Board refused to advise employees who might be witnesses that they would not be retaliated against for truthful testimony. Employees of Respondent are in great fear of Defendant Lutz and believe they will be fired. The Board is obviously hiding the truth where they cannot agree to such a reasonable request. b. The Board assigned its own personal attorney to represent Lutz. The bias of the Board in favor of their own attorney is obvious. c. The Board allowed, condoned, or ignored the loss or destruction of evidence by not providing or addressing Larissa's missing notes. Apparently, they accepted the fact that the notes were stolen from her office and did nothing. d. The Board refused to even answer if it participated in the decision to fire Larissa. Not only is this information necessary to prepare Larissa's case, but it might require recusal of biased Board Members. Again, the refusal to answer such a simple question shows they are hiding the truth. e. The Plaintiff had no access to witnesses and limited access to just a few emails between her and Lutz. Obviously, Lutz had unlimited access to witnesses and documents, and has used them out of context to unfairly attack Larissa.

58.     Rather than address the lack of due process at all, the Board scheduled and conducted a sham "hearing" knowing that Larissa would not be there.

59.     Defendant Lutz has demonstrated his dishonesty by falsely claiming he is a resident of Currituck County. A state statute and his contract require him to be a resident of the County where he is Superintendent. A recent newspaper article documents that Lutz recently admitted that he does not live in Currituck County, so he has, according to the author, been lying about his residency to keep his job. If a person will lie about his residency to keep his job, he will likely lie about his sexual harassment of another person because that would also threaten his job.

60.     Defendant Lutz makes many false statements in an effort to cover up his sexual harassment. The fabrication and exaggeration of claims against the Plaintiff actually demonstrate that the real motive for her "termination" was her refusal to cooperate with the sexual harassment by Lutz.

61.     Defendant Lutz states that he met with the Plaintiff on July 15, 2021, and "informed her of his intention to dismiss her," and that Larissa refused to resign. Defendant Lutz only gave her two frivolous reasons as to her firing which he himself describes as: "Mrs. York asked for an explanation. At which time I referred to the discovery of the $1million (sic) in savings for the fiscal year. I also addressed the reverted $10,000 in TSI funds." He falsely claimed that she caused TSI funds to be lost, when he had full responsibility for TSI funds. Also, he claimed that there was an unacceptable surplus of $1,000,000, which was entirely understandable due to funds saved during the school closures related to the COVID pandemic. These were the only two alleged reasons for firing her, and these are the only reasons he considered at the time of the firing.

62. He did not mention what should be extremely important allegations that were later fabricated by him concerning insubordination, poor job performance, insufficient work hours, and so on, because those are not reasons that he considered for her firing. Certainly, he must have not taken the firing of a high-level administrator lightly and been so completely unprepared as to ignore what he later claims

were compelling reasons for Plaintiff's termination. It was only after he learned that the Plaintiff was revealing his sexual harassment that he felt the need to fabricate even more reasons in an attempt to escape accountability. These fabricated reasons were an afterthought to try to justify the unjustifiable. Apparently, Lutz realized the poor reasons he provided when he terminated the Plaintiff and knew they could not withstand scrutiny when there was evidence of sexual harassment. So, he took nearly a week to make up new allegations which were obviously not part of his consideration when he terminated the Plaintiff. Since he had no justified reason to fire the Plaintiff when he terminated her, the only logical conclusion is that he terminated her due to his sexual harassment.

63.     Lutz dishonestly and frivolously seeks to use a surplus of $1,000,000 to justify the firing of the Plaintiff. Lutz is incorrect that the surplus was unexpected as he knew that, with the closing of schools due to COVID, there would be some funds that were not spent and therefore a resulting surplus. If he claims otherwise, he is either dishonest or incompetent, or both. What was unexpected, as no one could predict exactly the amount of the surplus as things were changing every day in unexpected ways, was the amount of the surplus.

64.     Allegedly, "[a]ccording to Ms. Mizelle and other finance professionals, it is completely unacceptable for Ms. York to have discovered such a large surplus so late in the fiscal year." RPS at 3. Not surprisingly, Lutz does not identify these "other financial professionals." They either do not exist or they do not have the expertise to make such a stupid statement in the context of a pandemic where nothing was exactly predictable as to finances. Ms. Mizell is less experienced and knowledgeable than the Plaintiff about school finance and her opinion is obviously flawed. What is unacceptable is a person who has never been a Chief Financial Officer, until they now schemed with Defendant Lutz to obtain the job, to render such an unfounded opinion. No one could predict the exact amount of the surplus. That fact is proven by other Chief Financial Officers across the state who all had large surpluses, but

none of them were fired for their surpluses. One county even had a $3,000,000 surplus but that did not cause a good superintendent to question the competency of his chief financial officer.

65.    Lutz again takes a statement out of context and distorts its true meaning to claim that the Plaintiff did not know the reason for the surplus. The Plaintiff had been repeatedly insulted and attacked unfairly for months due to her refusal to give into Defendants' Lutz's sexual advances. She would obviously be cautious in stating just general reasons for the surplus as she knew she would be attacked. When Lutz asked about the reason for the surplus, which Larissa knew the answer generally just as should Lutz have known the general answer, she stated something to the effect of not knowing. What she meant, and what any intelligent person would have known that she meant, was that she needed to review numbers to determine the exact components of the surplus. It is absurd to claim that the Plaintiff, with all her experience and training, did not know generally the cause of the surplus.

66.    The exaggeration and distortion of the facts by Defendant Lutz is again evidenced by the statement: "Lutz followed up by requesting a detailed analysis of the source of funds within one week," and "York responded by requesting an additional week." The false implication is that the Plaintiff was not prompt in her response and took another week. Beyond the fact that a week was just an arbitrary deadline imposed by Defendant Lutz with no significance, and beyond the fact that Defendant Lutz granted another week, Larissa only took eight (8) days to respond, not two (2) weeks. Defendant Lutz fails to mention this fact because it does not fit his false narrative against Larissa. This and other distortions by Defendant Lutz are further evidence of his guilt and his attempt to cover up his sexual harassment.

67.    Furthermore, the request for specifics as to the large surplus was made during the very busiest and most important time of the year, as the final entries for the year are being made to prepare for outside audit. Defendant Lutz knows this fact but he fails to mention it, and instead he seeks to

disingenuously imply that the request for another week was unreasonable. Again, this deception is a desperate attempt by Defendant Lutz to conceal his sexual harassment.

68.     Continuing to belatedly add to his false claims, Defendant Lutz claims that the explanation provided by Larissa lacked "sufficient detail and depth."  Lutz did not allege this at the termination meeting or in his subsequent list of reasons for terminating Larissa. Such an important point would surely have been covered at those times, if there was any truth to the allegation. He does not explain how it lacked sufficient detail or depth. Also, there is again no documentation whatsoever to support his dissatisfaction with the report. Defendant Lutz did not believe the summary was inadequate and has fabricated this claim to hide his true illegal motive.

69.     Defendant Lutz claims that he noticed issues with Larissa's "performance even before he was appointed Superintendent." He claims that he "became aware that the State Department of Public Instruction ("DPI") was reverting Targeted School Improvement funds because of Ms. York's mismanagement of the district's finances." These outrageous claims demonstrate the great dishonesty of Defendant Lutz. It was Defendant Lutz who was responsible for the TSI funds and who caused the reverting of any funds. Defendant Lutz not only dishonestly accuses Larissa of a problem that he caused, but he seeks to use this situation to hide his own misfeasance. Note that Defendant Lutz did not document any communication or disciplinary action with the Plaintiff to support his claim that he discovered that she had caused funds to be reverted. There is no correspondence from Lutz to Larissa documenting that she was to blame for this reverting of funds. There is also no notation in her personnel file that she had caused funds to be reverted. The reason there was no documentation by Lutz was because Lutz knew that he was responsible for this problem.

70.     If Lutz really had justifications to fire Larissa, he would not have required nearly a week to reveal them. He is so desperate to discredit Larissa that he not only lies, but he includes ridiculously frivolous claims that no reasonable person would think justified the termination of any employee.

71.     In desperation, after learning that his sexual harassment had been revealed, and Defendant Lutz despicably fabricated several additional claims against the Plaintiff, which on their face are mostly frivolous and reveal his true evil motive to harm Larissa because she refused his sexual advances.

72.     Ridiculously, the Plaintiff was fired because she brought a cat to work. This claim by Lutz lacks any merit and it is little wonder that he abandoned it in his arguments to the Federal Investigator and the EEOC. Even without explaining what really happened, this position by Lutz is so stupid that it should be rejected just on its face. Bringing a cat to work should not result in termination, especially not when the Plaintiff removed it as soon as requested by Defendant Lutz.

73.     Furthermore, there are more details that make the firing over a cat even more ridiculous. First of all, the cat was needed because the Superintendent did not remedy the unidentified vermin that lived in the attic of the home that was being used as the Finance Office that left droppings in the work area of the Plaintiff's staff. It was a serious health risk, left unresolved by Defendant Lutz, that a cat might help remedy. Secondly, this was a home-like setting being used as a Finance Office so only the Plaintiff and her staff were exposed to the cat, and no school students or other office workers would contact the cat. Also, the Plaintiff felt that a cat would help with the low morale of her office from the pandemic, and all her staff stated they wanted the cat. The Plaintiff checked with another person in the Schools who had a pet in the classroom, and Larissa was advised that a cat would be alright. As Superintendent, Defendant Lutz can direct that a cat not be in the Finance Office, and all it would have required was a friendly note or call directing her to remove the cat. The evil motive of Lutz is evidenced by the fact that he did not choose the easy friendly course, and instead he had to elevate a minor matter to a major issue of having a formal meeting with the HR Director and placing a note in Larissa's personnel file.

74.     Clearly, on May 26, 2021, Defendant Lutz was already unfairly targeting Larissa when he misused and exaggerated the situation with the cat to target the Plaintiff. Not only does this contradict his claim that he did not think of firing the Plaintiff until June, but it makes it inexplicable why he

19

would not document other alleged bad actions by the Plaintiff in her personnel file, if he would document something so minor and unimportant as a cat. If you will document a cat that was immediately removed, certainly you would document insubordination, poor work, poor attendance, and other serious accusations. As noted below, again and again, Lutz fails to document any of these alleged deficiencies in Plaintiff's work that would, if true, be far worse than a cat. Defendant Lutz is a liar, and his lack of documentation proves that fact.

75.     The only other item that Lutz documented in Larissa's personnel file is equally frivolous. He notes that: During the meeting to address the removal of the cat from the office, Defendant Lutz gave Mrs. York direction on how to request leave and that she was not entitled to compensation time for chaperoning the district's prom as a volunteer.  Defendant Lutz seemingly admits that the principal purpose of his meeting was to address a cat. As a side issue, he addressed the requesting of leave. However, since all leave requests were already submitted to Defendant Lutz by the Plaintiff, there was no need for a formal HR meeting to deny this one request. Again, a simple note or call would have sufficed to reject the leave request. It was the only time that he denied a leave request from the Plaintiff. The Plaintiff never again requested leave for the same type of activity, even though other School employees received leave for their chaperoning the prom. Since it was a school function, it is not unreasonable to request leave, and Defendant Lutz only needed to deny it. She had been told, at the time, by the High School Assistant Principal, that she would be given leave just like everyone else. Again, this is the type of petty issue that Defendant Lutz thought had to be documented in Larissa's personnel file, but then Defendant Lutz does not document other allegedly much more serious claims against Larissa. And again, his effort to document such a minor issue in May of 2021 shows that he is not being truthful when he claims he only thought of firing the Plaintiff in June.

76.     Defendant Lutz continues with his insignificant claims in his fabricated effort to justify the termination of Larissa to cover up his true improper motives.  He is critical that the Plaintiff attended a

prom meeting to discuss finances, even though Defendant Lutz admitted that he was advised by the Plaintiff that she would be attending. All he had to do was tell her no. Instead, he lays in wait to spring upon her with unfair criticism for a situation that he could have easily stopped. He mentions that the Plaintiff missed a meeting with him, but he knew that her attendance at the prom meeting far away would mean she might be late to their meeting. Since he did not object, the clear implication was that he approved of her attendance at the prom meeting and to her missing the meeting with him. Additionally, Defendant Lutz missed many meetings with Larissa without notice.

77. The lies continue when Lutz claims that "during a Board meeting Ms. York was unable to answer the question of a board member regarding how state lottery funds are allocated" and he allegedly had to "quickly intervene in order to avoid embarrassment to administration." Back in July of 2021, Defendant Lutz only claimed there was "awkwardness caused by the question," and there was no fault attributed to Larissa, but now, seven months later, it has grown to "embarrassment of the administration." Strange how his complaints grow each day as Defendant Lutz becomes more desperate. These allegations are absurd as any review of the recorded Board meeting will reveal. There is no embarrassment or awkwardness in the exchange between the Board and the Plaintiff, and the very short exchange of information was insignificant. In fact, this allegation shows the desperation of Defendant Lutz to fabricate some excuse for firing the Plaintiff because he knows the real motive was her refusal to give in to his sexual advances. Again, there is no correspondence between Defendant Lutz and the Plaintiff that supports his alleged dissatisfaction with her interaction with the Board on the state lottery, and again there is no reference in her personnel file to any alleged dissatisfaction with her handling of the Board.

78. Next, unbelievably, Defendant Lutz claims without any documentation whatsoever that he met with the Plaintiff to discuss four issues: that he requested that she meet with all directors on a monthly scheduled basis, that he requested that she establish procedures on the transfer of funds, that he

addressed her workday and the expectation that she work a minimum of eight hours a day, and that he discussed the importance of focusing on the role of finance officer. Again, Defendant Lutz distorts and exaggerates the facts to try to falsely imply bad conduct by the Plaintiff. Please note that this alleged meeting occurred after the initial groping of the Plaintiff by Defendant Lutz and her refusal to cooperate with his sexual advances, so any claim by Defendant Lutz is pure fabrication to intimidate her to accept his sexual advances. Once again, there is no documentation that supports the implications that she did not have meetings with directors, that she did not have procedures for transferring funds, that she did not put in eight hours a day, or that she did not focus on the role of finance officer. For example, in particular, there is absolutely no documentation that she was not spending eight hours a day at work, and in fact she spent much more than a 40-hour week working for the Defendants if you include all the after hours meetings and events that she attended. No documentation exists in any communications from Defendant Lutz to her or in her personnel file. These alleged criticisms were created out of whole cloth to intimidate the Plaintiff into submission shortly after his sexual advances had been rejected. In fact, if this meeting had occurred as claimed and those matters had been discussed, where is the documentation in her personnel file just as he later documented the frivolous claims over bringing a cat to work and his review of comp time policy. Obviously, these claims were more important than bringing a cat to work, but inexplicably he decided not to document this alleged interaction with Larissa by any memo, email, or other writing, or in her personnel file. Furthermore, none of these alleged issues were brought up during her meeting when she was terminated.

79.     Defendant Lutz was actually trying to force the Plaintiff into isolated situations early in the day or late in the day, or in strange locations, where he could take unfair advantage of her. At this point in time, the Plaintiff had already started to avoid any situation where she would be alone with Defendant Lutz so she could avoid any future improper advances, and this just angered him more and caused him

to fabricate claims that she was not meeting the expected number of hours in her work or was not focusing on the role of finance officer.

80. Defendant Lutz makes additional claims that are not supported by the few vague documents that he has produced or by any other evidence. He claims that he told the Plaintiff to schedule monthly meetings with district directors, but does not provide any documention that makes such a direction. Instead, he provides an email that vaguely refers to wanting to be included in notices of any monthly meetings, but that email does not dictate that she always have monthly meetings. Certainly, if this was such an important issue, Lutz could produce a memo or email or some other writing that confirmed his direction that she conduct monthly meetings with directors. Then to further distort the truth, he takes a memo that just refers to him being invited to monthly meetings, and claims that this supports his claim that the Plaintiff denied being directed to have monthly meetings. There is nothing in the provided email where Larissa states that she was either directed to have monthly meetings or that she denied being directed to have monthly meetings. Furthermore, that provided email actually refers to her monthly meetings with the bookkeepers, not the directors. So, his own produced document does not support his claims. Again, the effort of Defendant Lutz to fabricate claims against the Plaintiff actually demonstrates his guilt.

81. Defendant Lutz makes allegations against the Plaintiff that are clearly false because he either does not understand school finances or because he seeks to deceive. He boldly claims, four days after the termination, without checking the facts or with him knowing it to be false, that: "It was discovered that Federal Title IV Funds in the amount (sic) $32,000 were to be carried over." The false implication intended by Defendant Lutz is that this money was lost. Note that Defendant Lutz does not even say that Larissa was responsible for this alleged mistake. Even worse is the fact that this money is automatically carried over and was not lost. This is a baseless attack by Defendant Lutz, days after the termination, because he is so desperate to discredit Larissa that he will lie to cover his evil conduct..

82.     Similarly, there is no merit to the allegation that, on July 20, 2021, five days after Larissa's termination: "it was discovered the failure to rollover Reading Camp funds into the 21/22 fiscal year." Not only does Defendant Lutz fail to allege that the Plaintiff was responsible for this alleged failure, but the money is automatically rolled over by DPI every year. There was no money lost and nothing was done wrong by Larissa. Again, there is no reason to incorrectly imply bad conduct by the Plaintiff unless you are trying to hid your true illegal motive of forcing sexual contact on the Plaintiff.

83.     Defendant Lutz falsely complains about Larissa's "poor performance and insubordination." Besides the obvious falsity of the allegations against the Plaintiff, and the pettiness of some of the allegations, the only objective and reliable measure of the quality of Larissa's work is the annual audit conducted by an outside accounting firm for fiscal year July 1, 2020 to June 30, 2021. The audit found that Larissa's work was essentially perfect.  Clearly, if Larissa's work had been so deficient, the independent audit would have discovered problems, but it found no issues with her work. Clearly, the claim of poor performance is a blatant lie that was created to conceal the sexual harassment by Defendant Lutz.

84.     Defendant Lutz claims that he "noted" Larissa's poor performance, but the actual fact is that he never noted any alleged poor performance in any formal manner in her personnel file.  Certainly, if there had been poor performance there would have been entries in her personnel file. Also, there are no memos, emails, or other writings by Lutz that documented the alleged poor performance. There would have been communications of some sort between Defendant Lutz and the Plaintiff, or with others, about this "poor performance," but there is nothing to or from Lutz supporting this fabrication. Apparently, the alleged "poor performance" was a well-kept secret by Lutz until he needed to create a fake defense to the sexual harassment charges.

85.     As to alleged "insubordination," the official documentation is completely devoid of any such alleged insubordination. There is absolutely nothing in her personnel file that documented

insubordination, because it never occurred. Defendant Lutz vaguely claims without any support that the "assistant finance officer and other senior staff" noted the "poor performance" of Larissa. Again, there is no documentation in correspondence or in Larissa's personnel file to support this claim of poor performance. The allegation of insubordination was fabricated to divert everyone from the sexual harassment committed by Defendant Lutz.

86.     Lutz also claims that, after he became Superintendent, he began to receive complaints from district directors regarding Ms. York's practices. The only example he can provide in support of this frivolous claim is that two directors had "expressed concerns to Dr. Lutz that Ms. York would transfer funds within their budgets without first seeking their input or approval." In contrast to these two directors that often mismanaged and overspent their budgets, there are literally dozens of other directors, principals, and employees who would say that the Plaintiff did a wonderful job. Also, as the Chief Financial Officer it was clearly within her authority to transfer funds within their budgets to make sure that things were paid in a timely and responsible manner. She would not have needed to take this action if the budgets had been handled correctly by these two directors. A good superintendent would have commended Larissa for taking this action to make sure that money was appropriately used within the budgets for these two departments and would have backed her up against these complaining directors, but instead Lutz distorts the normal functions of a Chief Financial Officer to falsely argue that she has somehow not performed well. And again, there is no negative comment in her personnel file concerning this alleged transfer of funds and there is no direct communication from Lutz to her supporting the claim that what she did was improper. This allegation is clearly a fabrication and an exaggeration by Lutz enabling him to attempt to avoid responsibility for his sexual harassment of Larissa.

87.     Lutz continues to misrepresent the facts by claiming that Larissa was "dishonest in a Board meeting when she stated to the Board that she always sought approval of the Superintendent and

25

directors before transferring funds." Back in July of 2021, there was only a claim that Larissa had stated that she always checked with Superintendent and Directors before moving funds, but now, seven months later, this had metastasized into an allegation of dishonesty. Any honest and intelligent review of the Board meeting, which is available on videotape, would demonstrate that Larissa was referring to moving funds between programs or departments, and was not referring to the allocation of funds within a particular program or departmental budget. A Chief Financial Officer does not need to obtain permission from a director to properly allocate funds within their budgets when they have mishandled their budgets. Lutz constantly misrepresents the statements of Larissa to always put a dishonest spin on their meaning. Again, there is no documentation in any communication or in Larissa's personnel file to support this claim that she performed improperly.

88.     The dishonesty of Defendant Lutz continues as he claims that "Ms. York had submitted a budget amendment that would have had significant ramifications regarding the district's allocation of federal funding." Always the one to exaggerate and distort to avoid punishment for his sexual harassment, Defendant Lutz only vaguely refers to "significant ramifications" without specifying what he is referring to. Defendant Lutz is again trying to unfairly take advantage of a situation so that he can falsely imply something bad had occurred. These are normal communications that occur constantly between DPI and school districts to conduct the business of the schools. The alleged documentation provided by Lutz does not place blame on Larissa and does not even state that there were any bad ramifications. The budget amendment was processed in the normal routine of a Chief Financial Officer and there was no resulting problem that occurred. And, once again, there is no correspondence from Defendant Lutz to the Plaintiff criticizing this conduct and there was nothing in her personnel file that documented any alleged misconduct. These allegations are again just fabrications and exaggerations so that Lutz can avoid accountability for his sexual harassment.

89.     For the very first time, several months after the termination of the Plaintiff, Defendant Lutz

claims that "members of the finance office had noted that Ms. York tended to arrive much later than

other members of the office and that she rarely worked an 8-hour day."  This is obviously not true that

others had criticized her length of workday, because is it not documented anywhere in correspondence

or in her personnel file. Since the Plaintiff worked later each day than others in her office, as they

would leave before her, until the sexual assault of her, they could not have possibly known how many

hours she worked each day. Also, other persons in her office were not with her when she attended

meetings and other events outside of the normal workday. Again, note the deceptive false implication

that Defendant Lutz makes by saying that Larissa "tended to arrive much later than other members of

the office" as he does not address when she left the office and he does not address all the extra

functions outside the office that she attended on behalf of the Schools. Despite the disrespect that Lutz

showed Larissa as the Chief Finance Officer, chief financial officers are part of the administration and

have some flexibility as to their hours because of their many tasks and many obligations outside the

office. The real motive of Lutz was to force Larissa to come in early or stay late so he could isolate her

from others and then he could continue his sexual harassment without the observation of any witnesses.

90.     Allegedly, Defendant Lutz claims he "addressed an issue of dishonesty and insubordination by

Ms. York." Supposedly, Larissa had "chosen to breach protocol by directly placing a school level

bookkeeper on an action plan, which would normally be done by school principal." Back in July of

2021, Lutz failed to allege any "dishonesty and insubordination" regarding this incident, and, in fact,

Lutz does not even state that "Ms. Mackin had done no such thing [authorizing Larissa to act]." That is

such a crucial fact, if it was true, that it would not take Lutz seven months to remember it or to coerce

the HR Director into saying it. Amazingly, there is again no documentation in any correspondence or

any entry in the personnel file to support this claim. The Plaintiff was told to move forward with the

action plan by the HR Director, and she was told to have a meeting with the bookkeeper and the

principal, and Defendant Lutz does not provide any documentation to contradict those facts. Since this matter with Mrs. Davenport was a financial matter, Larissa was authorized to take direct action. Please note that the original statement as to the circumstances surrounding this action plan did not state that the HR director denied authorization, but now months later there is the unsupported claim that "Ms. Mackin [the HR Director] had done no such thing." Defendant Lutz keeps adding to his story day after day so that he can present a moving target that is difficult to dispute. In any case, if there had been such dishonesty and insubordination, it most certainly would have been the subject of some notation within the personnel file, but there is no written documentation of any of these claims.

91.    The continued fabrication and exaggeration of claims is demonstrated by the recent addition of yet another belated alleged justification for the firing of the Plaintiff. Please note that this allegation was not made at the meeting at the time of her firing and was not made in the subsequent list of items supposedly justifying the firing. For the first time, Defendant Lutz claimed that "Ms. York directly disobeyed a directive from... Lutz to move management of career and technical education finances to a particular employee" and "Ms. Mizelle heard Ms. York to defiantly state that she was refusing... Lutz's directive." Ms. Mizelle, according to Defendant Lutz, falsely advised him that the financial office was going to implode under the Plaintiff. Not surprisingly, there is again no documentation in any correspondence or in the personnel file that supports this serious claim. In fact, this extremely serious matter of supposedly disobeying her superior was not even worthy of mention at the meeting where she was terminated or in the subsequent statement of reasons for her termination.

92.    Ms. Mizelle is not only under the direct intimidation and control of Lutz, but she also benefited greatly by assuming Larissa's position as chief financial officer. Ms. Mizelle made these false claims to apparently undermine her superior so that she could please Defendant Lutz and she could assume the role of chief financial officer. Also, as a supposedly devoted staff member working under Larissa, there is no documentation by Ms. Mizelle that she advised Larissa of her concerns or that any action was

needed to avoid an "implosion". If she believed these allegations to be true, she had an obligation to advise the Plaintiff and to encourage corrective action. There is no such documentation because it is all a lie fabricated after the firing to protect her supervisor, Defendant Lutz, and to secure the position of Chief Financial Officer for herself.

93.     Defendant Lutz claims that "Ms. Mizelle approached [weeks before the Plaintiff was terminated]... Lutz and expressed concern that the district may 'implode' due to Ms. York's incompetency and performance." If the statements were actually made, not only are they obviously false, but they were intended to assist Defendant Lutz in covering up his sexual harassment, and resulted in the termination of the Plaintiff.  It is disappointing to believe that Ms. Mizelle would lie so she could secure Larissa's position as chief financial officer. Again, if a superintendent was advised that his school district was going to "implode," there would be some documentation of some communication with the alleged responsible party to discuss this problem or some notation in her personnel file. It defies belief that this occurred if there is no such documentation that this was ever addressed.

94.     This statement as to the possible "implosion" of the Schools, if ever made, is provably false. Not only has the school district not "imploded" in any manner or form, but the independent audit for this time period clearly demonstrates the opposite in that it shows that sound accounting practices were used by the Plaintiff. This allegation is outrageous and reprehensible, and was intended by Defendant Mizzelle to end the Plaintiff's employment with Defendant CCS.

95.     Despite all his previous attacks and criticisms of the Plaintiff, Defendant Lutz claims that he did not begin "to think seriously about removing Ms. York from her position" until June 2021. If all the terrible things were true that Lutz alleged, he would not wait until June 2021 to think about replacing her. He also would not have waited until mid-July after all the books were closed at the end of the fiscal year.  The actions of Defendant Lutz in delaying the termination, until a convenient time for

himself after the fiscal year was essentially closed, demonstrate that the Plaintiff was performing well as she was allowed to complete the work for the fiscal year. Obviously, the allegations of bad work and the threat of an "implosion" have been fabricated to unfairly and deceptively support her firing and to hide Defendant Lutz's misconduct.

96.     In reality, Lutz was obviously setting the Plaintiff up to be fired from the very minute that he first sexually groped her and she refused him. All the bad conduct of Defendant Lutz, including ultimately the termination of the Plaintiff, is directly related to the refusal of the Plaintiff to engage in sexual relations with Defendant Lutz.

97.     The weakness of the claims by Defendant Lutz is further evidenced by the continuing effort to add more allegations even months after Plaintiff's termination. Since these claims occurred after the termination of Larissa, and often months after, they obviously did not at all factor into the decision to dismiss her. In any case, the new allegations by Lutz are also inaccurate and deceptive, and thereby evidence his effort to hide his sexual harassment of the Plaintiff.

98.     Defendant Lutz belatedly claims: "Following Ms. York's dismissal, the school system discovered that due to Ms. York not properly calculating the number of charter school students in Currituck County as part of the school system's average daily enrollment, the district lost approximately $270,853 of local funding over a two-year period."  Defendant Lutz does not at all demonstrate the amount of any alleged loss or the person responsible for that loss. Furthermore, once again, Defendant Lutz attempts to blame Larissa for somebody else's failures. The form used for calculating the number of charter school students was created by the previous Chief Financial Officer, who was brought back to work for a short period of time, and if it was an erroneous form then the fault lies with the previous Chief Financial Officer. A new Chief Financial Officer, as was the case with Larissa, cannot possibly change every form and procedure that existed at the time she begins her work, and she had no reason to doubt the accuracy or reliability of the form that was used by the previous

Chief Financial Officer. The Plaintiff did not develop this form and was not responsible if it was improper or incomplete, as she had a reasonable expectation that she could rely on the work of the previous Chief Financial Officer. Furthermore, Larissa completed this form as existed from the previous Chief Financial Officer on the provided school computer, and then she obtained approval from the County that the numbers were accurate. As a result, if the calculation of charter school students was really inaccurate, this was not caught by the County, and Larissa had every reasonable expectation that she could rely upon the confirmation of the accuracy of the student count from the County.

99.     Defendant Lutz tries to set up a smoke screen alleging many reasons for her termination, but most, if not all, of those fabrications are easily rebutted by the Plaintiff. Just the fact alone that some of those allegations are exposed as mere pretexts for her termination demonstrates that Defendant Lutz was actually motivated by the refusal of his sexual advances. A person would not fabricate, exaggerate, and distort events to make false allegations like Defendant Lutz unless he was motivated by an evil intent, which in this case was his evil retaliation for the Plaintiff not giving into his sexual assault.  The fact that Lutz makes so many false claims against Larissa, and many of them are revealed to be false, is sufficient to show that Lutz was truly motivated by his sexual harassment to fire her.

100.     Defendant Lutz threatened Plaintiff's job, and impliedly warned her that she could suffer the same fate as a Principal (who was terminated by Defendant Lutz) if she did not respect and obey Defendant Lutz, because he was her boss, and he repeatedly reminded her that she served at his "pleasure." He next impliedly warned her that her career would be fine if she engaged in an affair like an assistant principal, whom he had supervised, but that her career would suffer if she did not do the same as this assistant principal.  Plaintiff understood these threats to mean that Defendant Lutz was trying to intimidate her to not reject his advances.

101.    On July 15, 2021, Defendant Lutz, under authority from Defendant Currituck County Schools, terminated Plaintiff in retaliation for her declining his sexual advances.

102.    Defendant Lutz was empowered by Defendant CCS to take tangible employment actions against the Plaintiff, who was then victimized by Defendant Lutz. Defendant Lutz next took a tangible employment action against the Plaintiff based upon the Plaintiff's refusal to accede to his sexual demands.  The sexual harassment by Defendant Lutz of Plaintiff culminated in the tangible employment action of her dismissal.

103.    But for the sex of the Plaintiff, her being a female, she would never have been terminated by Defendant Lutz.

104.    The sex of Plaintiff was a motivating factor in her termination by Defendant Lutz.
The obvious underlying motivation of Defendant Lutz to fire the Plaintiff was because she would not give in to Defendant Lutz's prurient and perverted desires.

105.    Defendant Lutz intentionally fired the Plaintiff based mostly upon, or at least in part upon, her sex.

106.    Defendant Lutz was determined to fire Larissa because she refused his sexual advances, and he then set about to fabricate, distort,and exaggerate the facts to accomplish this illegal despicable goal.

107.    Defendant CCS is responsible  for employing a bad person like Defendant Lutz in a supervisory position that allowed him to sexually harass and then terminate a subordinate, and for ratifying and supporting the sexual harassment by denying the Plaintiff reasonable due process to prove the sexual harassment.

108.    The hearing offered by the Defendant CCS was a sham, and the Plaintiff needed to decline to participate in a biased predetermined process that clearly denied her any due process.  The inadequate hearing process shows the support of Defendant CCS for the sexual harasser and its hostility towards the victim.

109.    There was never an adequate system for registering complaints within Currituck County Schools, and Defendant CCS discouraged complaints from being reported or pursued.

# IV. CLAIMS FOR RELIEF

## COUNT I: TITLE VII SEXUAL HARASSMENT BY DEFENDANT LUTZ
## THROUGH DEFENDANT CURRITUCK COUNTY SCHOOLS
### (Violation of Title VII of the Civil Rights Act of 1964 cause of action against Defendant Currituck County Schools)

110.    Plaintiff reasserts and incorporates Paragraphs One (1) through One Hundred Nine (109) of this Complaint as if fully set forth herein.

111.    The foregoing conduct by Defendant constitutes unlawful harassment and discrimination against Plaintiff on the basis of her sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000c et 5661., ("Title VII").

112.    Plaintiff is, and at all relevant times was, an employee covered by the protections of Title VII of the Civil Rights Act of 1964 ("Title VII") as defined in 42 U.S.C. §2000e(f).

113.    Defendant Currituck County Schools is, and at all relevant times was, an employer as defined in 42 U.S.C. § 2000e(b) subject to the prohibitions of Title VII.

114.    Title VII prohibits discrimination based on sex.

115.    Plaintiff is a member of a protected class by virtue of her gender.

116.    Plaintiff was subjected to unwelcome sexual harassment from Defendant Lutz, her supervisor, in the form of sexual advances, unwelcome physical contact, sexually suggestive verbal comments, unwanted content of a sexual nature, repeated attempts to isolate her to place her in a vulnerable position, the threat of further unwanted contact of a sexual nature, hostile treatment, and fabricated complaints against her during her employment with Defendant.

117.    The harassment was based on Plaintiff's sex.

118.    The harassment Plaintiff experienced was sufficiently severe to alter the terms and conditions of her employment and create a discriminatorily abusive working environment.

119. Defendant Lutz used his position to take tangible employment actions against Plaintiff by firing her, harassing her, and otherwise altering the terms and conditions of her employment because she rejected her manager's advances.

120. Plaintiff suffered intentional, unwanted harassment because of her sex; the harassment was severe and pervasive; the harassment negatively affected the terms, conditions, or privileges of her employment; the harassment was sex-based; the harassment would detrimentally affect a reasonable person of the same sex.

121. As a result of the harassment, Plaintiff suffered emotional distress. Defendant Lutz discharged Plaintiff. Defendant Lutz intentionally created and harbored a work environment that was intolerable.

122. Defendant Lutz was empowered by Defendant CCS to take tangible employment actions against the Plaintiff who was victimized by Defendant Lutz.

123. Defendant Lutz took a tangible employment action against the Plaintiff based upon the Plaintiff's refusal to accede to his sexual demands.

124. The sexual harassment by Defendant Lutz of Plaintiff culminated in the tangible employment action of her dismissal, and therefore Defendant CCS is strictly liable for this sexual discrimination.

125. As an actual, proximate, and foreseeable result of the actions of Defendant Lutz, Plaintiff has suffered lost income and other fringe benefits, damage to reputation, emotional distress, mental distress and anxiety, depression, embarrassment, humiliation, and other compensatory damages.

126. Defendant Lutz's actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendant Lutz's conduct, Plaintiff is entitled to recover punitive damages.

127. Defendant CCS's officers, directors, and managers condoned and ratified the malicious, willful, wanton, and reckless conduct alleged above by not allowing the Plaintiff any fair and reasonable due process.

128.    Plaintiff experienced the adverse employment action of termination.

129.    The aforesaid discriminatory treatment of Plaintiff was the direct and proximate result of Plaintiff being a member of a protected class under Title VII, specifically, because she is female.

130.    Any purported reason offered by Defendant for its treatment of Plaintiff is merely pretext and pure fabrication.

131.    Defendants' discriminatory and wrongful acts are willful, intentional, and purposeful within the meaning of Title VII and warrant the imposition of liquidated damages.

132.    As a direct and proximate result of Defendants' violation of Title VII, Plaintiff sustained permanent and irreparable harm, resulting in discharge and the loss of her employment, which caused her to sustain a loss of earnings, plus the value of certain benefits, loss of earning capacity, plus back pay and front pay, past and future wages and interest thereon, pension and retirement and other lost benefits, and attorney's fees and costs.

133.    As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by Defendants in violation of Title VII, Plaintiff suffered severe emotional stress, embarrassment, humiliation, loss of reputation and loss of self-esteem.

## COUNT II: PUBLIC POLICY WRONGFUL DISCHARGE BY DEFENDANT CURRITUCK COUNTY SCHOOLS
### (Wrongful Discharge cause of action against Defendant CCS)

134.    Plaintiff reasserts and incorporates Paragraphs One (1) through One Hundred Thirty-Three (133) of her Complaint as if fully set forth herein.

135.    Defendant CCS engaged in conduct inconsistent with the public policies expressed in N.C. Gen.Stat. § 143-422.2(a) ("[i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees).

136.    Defendant CCS terminated Plaintiff, which constitutes the adverse action.

137.    Defendant CCS terminated Plaintiff because of her sex, which contravened the public policies stated in N.C. Gen. Stat. § 143-422.2(a).

138.    Plaintiff further brings this action against Defendant CCS for wrongful discharge in violation of public policy under N.C. Gen. Stat. § 143-422.1, et seq., N.C. Gen. Stat. § 95-126 et seq., and N.C. Gen. Stat. § 95-421 et seq.

139.    Defendant CCS employed at least fifteen (15) employees at all relevant times.

140.    Defendant CCS violated the public policy of North Carolina by terminating Plaintiff based on her sex. Such conduct is injurious to the public policy of the State of North Carolina.

141.    As an actual, proximate, and foreseeable consequence of Defendant CCS's conduct, Plaintiff has suffered lost income, emotional distress, anxiety, humiliation, expenses, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

142.    Defendant CCS's actions were done maliciously, willfully or wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendant CCS's conduct, Plaintiff is entitled to recover punitive damages in an amount to be determined at trial.

143.    Defendant's officers, directors, and managers condoned and ratified the malicious, willful, wanton, and reckless conduct alleged above.

## COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY ALL DEFENDANTS
### (Intentional Infliction of Emotional Distress cause of action against Defendant Lutz, Defendant Mizelle, and Defendant CCS)

144.    Plaintiff reasserts and incorporates Paragraphs One (1) through One Hundred Forty-Three (143) of her Complaint as if fully set forth herein.

145.    All Defendants engaged in extreme and outrageous conduct directed at the Plaintiff.

146.    All Defendants engaged in conduct intended to cause severe emotional distress to the Plaintiff.

147.    The conduct of all Defendants in fact caused severe emotional distress to the Plaintiff.

148.    Defendant CCS ratified the conduct of Defendant Lutz and Defendant Mizelle by failing to provide to the Plaintiff a full and fair opportunity to defend herself from false allegations and in ratifying her unlawful dismissal, and CCS is therefore liable.

**COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP BY DEFENDANT MIZELLE AND DEFENDANT LUTZ**
**(Tortious Interference with Contractual Relationship cause of action against Defendant Mizelle and Defendant Lutz)**

149.    Plaintiff reasserts and incorporates Paragraphs One (1) through One Hundred Forty-Eight (148) of her Complaint as if fully set forth herein.

150.    The Plaintiff had a valid contractual relationship with Defendant CCS to provide services as a Chief Financial Officer.

151.    The valid ongoing contractual relationship between the Plaintiff and Defendant CCS conferred upon the Plaintiff a contractual right against Defendant CCS.

152.    Defendant Mizelle and Defendant Lutz knew of this valid ongoing contractual; relationship between the Plaintiff and Defendant CCS.

153.    Defendant Mizelle and Defendant Lutz intentionally interfered with this contractual relationship, both individually and jointly.

154.    The interference by Defendant Mizelle and Defendant Lutz was improper and without justification.

155.    Defendant Mizelle and Defendant Lutz, acting both separately and in conjunction with each other, intentionally and improperly induced Defendant CCS to breach and terminate its contractual relationship with the Plaintiff.

156.    Both Defendant Mizelle and Defendant Lutz lied in unfairly disparaging the quality of the work performed by the Plaintiff and in falsely accusing her of improper conduct.

157.    The primary purpose of the conduct of Defendant Mizelle's and Defendant Lutz's conduct was to cause the breach of the contractual relationship between Plaintiff and Defendant CCS.

40

158. The misrepresentations and lies of Defendant Mizelle and Defendant Lutz were made maliciously, intentionally, and without justification.

159. Defendant Lutz interfered improperly with her contractual relationship because he was motivated by revenge for her refusal to engage in sexual relations with him and he was seeking to avoid liability for his sexual harassment of the Plaintiff. These Defendants were substantially certain that their conduct would result in Plaintiff's termination.

160. Defendant Mizelle interfered improperly with Plaintiff's contractual relationship because she wanted favorable treatment from Defendant Lutz and she wanted the Plaintiff's position as Chief Financial Officer.

161. As a direct and proximate of the misconduct and interference by Defendant Mizelle and Defendant Lutz, the Plaintiff suffered damages in the loss of her employment.

162. The Plaintiff is entitled to receive compensatory damages, punitive damages, attorneys' fees, and costs against both Defendant Mizelle and Defendant Lutz, personally and individually.

163. The Court should also issue equitable relief against Defendant Mizelle barring her from the position of Chief Financial Officer so she does not benefit from her interference. Defendant Mizelle should also be ordered to return all wages in excess of her previous salary as an Assistant Financial Officer.

## COUNT V: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE  BY DEFENDANT MIZZELE AND DEFENDANT LUTZ
### (Tortious Interference with Prospective Economic Advantage Against Defendant Mizelle and Defendant Lutz)

164.    Plaintiff reasserts and incorporates Paragraphs One (1) through One Hundred Sixty-Three (163) of her Complaint as if fully set forth herein.

165.    The Plaintiff had an ongoing business relationship with the Defendant CCS to provide services as a Chief Financial Officer.

166.    This ongoing business relationship, and expected continuation of that business relationship, was reasonably likely to benefit the Plaintiff financially for manty years.  The Plaintiff had a reasonable expectation that this business relationship would continue in a similar vein for at least fifteen (15) more years. A continuation of the business relationship and even future contracts would have resulted but for the malicious interference by Defendant Mizelle and Defendant Lutz.

167.    Both Defendant Mizelle and Defendant Lutz knew of this continuing business relationship between the Plaintiff and Defendant CCS.

168.     Both Defendant Mizelle and Defendant Lutz, separately and jointly, intentionally interfered with the business relationship between the Plaintiff and Defendant CCS.

169.    The interference in this business relationship by both Defendant Mizelle and Defendant Lutz was improper, dishonest, malicious, intentional, and without justification.

170.    Defendant Mizelle and Defendant Lutz, acting both separately and in conjunction with each other, intentionally and improperly induced Defendant CCS to breach and terminate its business relationship with the Plaintiff.  Defendant CCS would have continued Plaintiff's employment or entered into future contracts with her but for the malicious interventions by Defendant Mizelle and Defendant Lutz.

171.    Both Defendant Mizelle and Defendant Lutz lied in unfairly disparaging the quality of the work performed by the Plaintiff and in falsely accusing her of improper conduct.

172.    The primary purpose of the conduct of Defendant Mizelle's and Defendant Lutz's conduct was to cause an end to the business relationship between Plaintiff and Defendant CCS, and to deny the plaintiff her prospective economic advantage.

173.    The misrepresentations and lies of Defendant Mizelle and Defendant Lutz were made maliciously, intentionally, and without justification.

174.    Defendant Lutz interfered improperly with her business relationship because he was motivated by revenge for her refusal to engage in sexual relations with him and he was seeking to avoid liability for his sexual harassment of the Plaintiff.  These Defendants were substantially certain that their conduct would result in Plaintiff's termination and the loss of her prospective economic advantage.

175.    Defendant Mizelle interfered improperly with Plaintiff's business relationship because she wanted favorable treatment from Defendant Lutz and she wanted the Plaintiff's position as Chief Financial Officer.

176.    As a direct and proximate of the misconduct and interference by Defendant Mizelle and Defendant Lutz, the Plaintiff suffered damages in the loss of her employment and of her prospective economic advantage.  The improper conduct of these Defendants caused Defendant CCS to disrupt its business relationship with the Plaintiff.

177.    The Plaintiff is entitled to receive compensatory damages, punitive damages, attorneys' fees, and costs against both Defendant Mizelle and Defendant Lutz, personally and individually.

178.    The Court should also issue equitable relief against Defendant Mizelle barring her from the position of Chief Financial Officer so she does not benefit from her interference.  Defendant Mizelle

should also be ordered to return all wages in excess of her previous salary as an Assistant Financial

Officer.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Honorable Court grant the following relief:

    a.  Trial by jury;

    b.  A finding that Defendants violated Plaintiff's rights as set forth herein;

    c.  Award to Plaintiff full back pay plus interest, front pay, compensatory damages, reasonable attorney'sfees, punitive damages and costs in accordance with Title VII and North Carolina common law;

    d.  Enter a judgment against Defendants and order Defendants to pay Plaintiff compensatory and punitive damages in an amount to be determined at trial;

    e.  Award to Plaintiff compensatory damages in excess of $1.000,000.00;

    e.  Award to Plaintiff punitive damages in excess of $1,000,000.00;

    f.  Award to Plaintiff all reasonable costs and attorney's fees incurred in connection with this action;

    g.  Issue an order barring Defendant Mizelle from holding the position of Chief Financial Officer and directing her to return all wages in excess of her salary as an Assistant Financial Officer;

    h.  Award to Plaintiff such other and further equitable relief as the Court deems appropriate under the circumstances;

    i.  Award to Plaintiff any other relief this Court deems proper and just.

Respectfully submitted this 19th day of September, 2022.

_/s/ Thomas B. York_

THOMAS B. YORK
1205 Argus Road

Kill Devil Hills, NC 27948

(252) 715-4608

N.C. Bar No. 18640

_Attorney for Plaintiff_

## **JURY DEMAND**

Plaintiff requests a jury trial on all questions of fact raised by this Complaint.

Respectfully submitted this 19th day of September, 2022.

/s/Thomas B. York
Thomas B. York
North Carolina Bar No. 18640
*Attorney for Plaintiff*

1205 Argus Road
Kill Devil Hills, NC 27948
T: (252) 715-4608
tyork@yorklaw.us

48